## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21-cr-00129-JAW |
| | ) | |
| KRISTOPHER CHURCHILL | ) | |

### ORDER ON MOTION TO SUPPRESS

Considering the totality of the circumstances, the Court grants a defendant's motion to suppress his interrogation statements due to law enforcement's failure to give *Miranda*[1] warnings when required and its misrepresentation of the right to counsel when given.

## I.    BACKGROUND

### A.    Procedural Background

On August 12, 2021, a grand jury returned an indictment charging Kristopher Churchill with one count of possession with intent to distribute four-hundred grams or more of fentanyl, in violation of 21 U.S.C. § 841(a)(1), with a related forfeiture allegation as to the $3,200 cash seized from his car by the Maine State Police on April 5, 2021. *Indictment* (ECF No. 16). On September 24, 2021, Mr. Churchill filed a motion to suppress his statements made during a jailhouse interview with federal agents several days after his arrest. *Mot. to Suppress Statements* (ECF No. 28). On October 18, 2021, Mr. Churchill filed an amended motion to suppress. *Am. Mot. to Suppress Statements* (ECF No. 33) (*Def.'s Mot.*). On November 12, 2021, the

---

[1]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

Government responded in opposition to Mr. Churchill's motion to suppress.  *Gov't's Resp. in Opp'n to Def. Def.'s Am. Mot. to Suppress* (ECF No. 34) (*Gov't's Opp'n*).  The Government filed additional materials with its opposition, including narratives and video from the Maine State Troopers who conducted the traffic stop, roadside search, and arrest.  *Id.*, Attach. 1, *Maine State Police Narrative Report Trooper Harrington* (*Trooper Harrington Report*); *id.*, Attach. 2, *Maine State Police Continuation Report Trooper Roddy* (*Trooper Roddy Report*); *id.*, Attach. 3, *Trooper Roddy's Cruiser Video* (*Cruiser Video*).  The Government also submitted the video and transcript from Mr. Churchill's jailhouse interview and the interviewing DEA agent's accompanying report.  *Id.*, Attach. 4, *TFO Jonathan Richards Report of Investigation Re: Interview of Kristopher Churchill* (*TFO Richards Report*); *id.*, Attach. 5, *Video Interview of Kristopher Churchill, Kennebec Sheriff's Dept.* (*Interview Video*); *id.*, Attach. 6, *Tr., Interview of Kristopher Churchill* (*Interview Tr.*).

## B.    Factual Background

### 1.    The Traffic Stop

On April 5, 2021, at approximately 11:29 p.m., Maine State Trooper Tyler Harrington pulled over a vehicle just north of the West Gardiner Toll Plaza.  *Trooper Harrington Report* at 1.  There were two males in the car, and neither had identification.  *Id.*  The driver, Mr. Churchill, did not have his driver's license with him but supplied the car's registration and said the car was registered to him.  *Id.*

Trooper Harrington asked the driver whether he would step out of the car, which Mr. Churchill did.  *Id.* at 2.  After confirming that Mr. Churchill did not have

any weapons, Trooper Harrington asked him where he was heading, and Mr. Churchill replied that he was going back home to Bangor, Maine. *Id.* Trooper Harrington asked Mr. Churchill where he was coming from and Mr. Churchill stated that he was coming from Methuen, Massachusetts. *Id.* Upon further questioning Mr. Churchill told Trooper Harrington that he had gone to Massachusetts to pick up a friend and that the passenger in the vehicle was Juanito. *Id.* Mr. Churchill told Trooper Harrington that he was dropping off Juanito to visit family in Maine. *Id.*

As it was drizzling, Trooper Harrington suggested to Mr. Churchill that they get in his cruiser and Mr. Churchill agreed to do so. *Id.* In the cruiser, Mr. Churchill verbally identified himself as Kristopher Churchill. *Id.* At that point, Trooper Harrington called for backup. *Id.* Trooper Harrington asked Mr. Churchill whether he had ever before been in trouble with the police and Mr. Churchill acknowledged that he had "a couple of OUIs back in the day." *Id.* Upon questioning, Mr. Churchill said he did not know Juanito's last name and that he was going to drop off Juanito in Brewer, Maine. *Id.*

On further questioning from Trooper Harrington, Mr. Churchill said that he had been paid by "some guy [he] know[s] from Bangor" to pick up Juanito, who "he did not really know . . . at all." *Id.* He explained that he was currently living out of his car, occasionally did things like this for money, and was "just trying to do a favor for a friend" by bringing Juanito from a house in Massachusetts up to his family. *Id.*

At this point, Trooper Harrington told Mr. Churchill that he was having trouble believing his story. *Id.* at 3. Trooper Harrington told Mr. Churchill that

3

Methuen was a high drug area and Mr. Churchill quickly said that it was not Methuen, but Salem, Massachusetts, where he picked up Juanito. *Id.* Upon questioning, Mr. Churchill also said that Juanito did not have any luggage with him. *Id.*

Finding Mr. Churchill's responses inconsistent and the circumstances indicative of potential drug activity, Trooper Harrington called a narcotics K-9 to the scene. *Id.* Shortly thereafter, in response to Trooper Harrington's earlier request for backup, Trooper Lauren Roddy arrived on the scene and at Trooper Harrington's request, began to deal with Juanito, the passenger. *Id.* While waiting for the K-9, Trooper Harrington continued to question Mr. Churchill. *Id.* When asked more closely about whether he had ever been arrested for anything drug-related, Mr. Churchill initially denied it but then admitted he had been arrested last year for possessing methamphetamine. *Id.* Specifically, Mr. Churchill told Trooper Harrington that he had gotten in trouble for having a small amount of methamphetamine and fentanyl on him. *Id.* Mr. Churchill also admitted that he had been clean but had relapsed, and in fact, he had used drugs that very morning. *Id.*

Trooper Harrington pressed Mr. Churchill about whether he had drugs in his car. *Id.* Mr. Churchill said that he only had a crack pipe in the car door and that was it. *Id.* Trooper Harrington expressed skepticism, saying that he doubted Mr. Churchill would drive all the way to Salem and not return with a useable amount for himself. *Id.* At that point, Trooper Harrington's attention was diverted for a time to Juanito and he secured Mr. Churchill in handcuffs in his cruiser. *Id.* After talking

4

to Juanito and having difficulty communicating with him because he spoke Spanish and did not appear to speak English, Trooper Harrington placed Juanito in his cruiser and transferred Mr. Churchill to Trooper Roddy's cruiser. *Id.* Corporal Record arrived on the scene with the K-9. *Id.* at 4. Corporal Record reported that the K-9 had indicated on the driver's side of Mr. Churchill's vehicle. *Id.* Corporal Record and Trooper Harrington searched the vehicle interior and found inside a first aid kit some brownish powder and loose U.S. currency. *Id.* Corporal Record found what was later identified as approximately 1.5 kilos of fentanyl, in a black plastic bag between the back-seat floorboard area, and $3,200 in U.S. currency. *Id.*; *Trooper Roddy Report* at 1. The troopers did not locate any other contraband in the vehicle. *Trooper Roddy Report* at 1.

After the large quantity of what appeared to be narcotics was found in Mr. Churchill's vehicle, Trooper Roddy returned to her cruiser and advised Mr. Churchill of his *Miranda* rights. *Id.* Mr. Churchill answered her questions. *Id.*; *Cruiser Video*. Trooper Roddy asked Mr. Churchill whose black sweatshirt was inside the vehicle and Mr. Churchill acknowledged it was his. *Trooper Roddy Report* at 1. Trooper Roddy was advised that a scale found inside the sweatshirt was used to measure narcotics. *Id.*

Both Mr. Churchill and his passenger were arrested and transported to the Kennebec County Jail, where they were charged with aggravated trafficking of fentanyl under state of Maine law. *Trooper Harrington Report* at 5. United States Customs and Border Patrol confirmed to Trooper Harrington that the passenger's

name was Erick Mejia, that he was in the United States illegally, and that he had
been arrested in 2020 in Massachusetts for drug possession. *Id.* at 4. Mr. Mejia's
trafficking charge was dismissed prior to his initial appearance. *Gov't's Opp'n* at 2
n.2. Mr. Churchill became the only suspect left in custody. *See id.*

### 2. The Custodial Interview

About two and a half days later, on April 8, 2021, at approximately 8:40 a.m.,
corrections officers handcuffed Mr. Churchill and placed him in a Kennebec County
Sheriff's Department interview room with DEA Task Force Officer (TFO) Jonathan
Richards and Homeland Security Investigations (HSI) Agent Stephen Morrill. *TFO
Richards Report* at 1. The entire interview was captured on video. *Id.*; *see Interview
Video.* During the first thirteen minutes, TFO Richards introduced himself and
Agent Morrill and asked Mr. Churchill for some basic identifying information. *TFO
Richards Report* at 2; *Interview Tr.* at 1-14. TFO Richards also asked Mr. Churchill
about his criminal record, his drug use and drug of choice, whether the cellphone
found in the car belonged to him, and whether the car belonged to him. *TFO Richards
Report* at 2; *Interview Tr.* at 1-14; *Def.'s Mot.* at 2. TFO Richards reminded Mr.
Churchill multiple times that he was the only individual from the traffic stop seizure
still in custody as his passenger had been released. *Interview Tr.* at 3:11-19, 4:11-12,
8:23-25.

After thirteen minutes, TFO Richards informed Mr. Churchill of his *Miranda*
rights, saying:

> TFO Richards: We are law enforcement officers. We want to ask you
> some questions, and before we do so, we want to explain to you your

6

rights. . . . All right.  You have the absolute right to remain silent. Do you understand that?

Kristopher Churchill: Yes.

TFO Richards: Anything you say can and will be used against you in a court of law.  Do you understand that?

Kristopher Churchill: Yes.

TFO Richards: You have the absolute right to the advice of a lawyer before any questioning and to the presence of a lawyer with you during questioning --

Kristopher Churchill: I can have a lawyer here?

TFO Richards: You can ask for a lawyer.  It's not practical.  They're not going to be able to get here today, right?  But we can stop until you get an attorney.  That is one of your rights.

Kristopher Churchill: What do you mean it's not practical?

TFO Richards: Well, it just -- it's just not.  But your options are to wait until you talk to an attorney, if you wanted to.

Kristopher Churchill: No.

TFO Richards: If you cannot afford a lawyer, one will be furnished to you free before any questioning, if you desire.  Do you understand that, Kristopher?

Kristopher Churchill: Yeah.

TFO Richards: Okay.  This is kind of -- and I have always thought this was probably the important one, it's -- it sounds -- Number 5, it's the last statement of your Miranda warning, if you decide to answer questions now, with or without a lawyer present, you have the right to stop answering at any time until you -- or to stop answering at any time until you can talk to a lawyer.  What does that mean to you?  Because this is really what -- this is an important -- they're all important, but this is kind of the grand -- you have the right to stop -- if you decide to answer questions now, with or without a lawyer present, you have the right to stop answering at any time -- at any time or to stop answering at any time until you talk to a lawyer.

7

TFO Richards went on to question Mr. Churchill about the frequency and logistics of his trips to Massachusetts, where drug sales and drop-offs were made in Maine, and how he was paid for driving in cash and in "fingers" of drugs. *Interview Tr.* at 17-74. TFO Richards also asked about the money and drugs found during the roadside search, whether Mr. Churchill also made drug deliveries himself, and about his contacts with "Juanito" and "John" who set up the drug runs. TFO Richards had Mr. Churchill unlock his phone, which Mr. Churchill said he used to contact "John." *Id.* After making a call to his mother, who also spoke with TFO Richards about her son's situation, Mr. Churchill asked to return to his room. *Id.* at 64:18. The interview lasted approximately one-hour and twenty-five minutes. *See Interview Video.*

## II.    POSITIONS OF THE PARTIES

### A.    Kristopher Churchill's Position

Mr. Churchill urges the Court to suppress any statements made during the jailhouse interview, both before and after TFO Richards advised him of his *Miranda* rights. *Def.'s Mot.* at 2, 7. He explains that "an accused, in custody, must be adequately and effectively apprised of his right to remain silent and to the assistance of counsel and the exercise of those rights must be fully honored." *Id.* at 1 (citing *Missouri v. Seibert*, 542 U.S. 600, 608 (2004)). He notes the Government's "burden of proving a defendant's voluntary, knowing, and intelligent waiver of his *Miranda* right by a preponderance of the evidence" based on the totality of the circumstances. *Id.*

Recounting the interview before TFO Richards informed him of his rights, Mr. Churchill emphasizes that "Richards . . . began by informing [him] that he was the

only individual still in custody," so as to "make [him] believe he had to answer questions and provide information to possibly be released like" the passenger. *Id.* at 2. According to Mr. Churchill, TFO Richards' "line of questioning was pointed and predicated upon the assumption that [he] used and/or sold drugs." *Id.* Mr. Churchill asserts that the *Miranda* warning "came only after [TFO Richards] had elicited several incriminating statements from him," citing TFO Richards' "recogni[tion] that his prior questioning had already elicited incriminating statements without proper *Mirand[izing]*." *Id.* Quoting TFO Richards' response that Mr. Churchill "could ask for a lawyer, it's not practical, they are not going to be able to get here today," Mr. Churchill argues that "[w]hen a law enforcement agent tells a defendant that obtaining one of his constitutional rights is 'not practical' it arguably follows that any statements made by Defendant were not a product of his free choice." *Id.* at 3.

Mr. Churchill argues that "any statements [he] made after he was advised of his *Miranda* rights should also be suppressed as fruit of the poisonous tree." *Id.* He reasons that "[b]ecause of the initial interrogation . . . without proper advisement of his rights, his subsequent statements were also obtained illegally and must be suppressed." *Id.* He insists that the initial *Miranda* warnings from Trooper Roddy at the scene of the arrest were not sufficient to cover TFO Richards' questioning because "the interrogation process resumed after an interruption." *Id.*

Mr. Churchill lays out "several objective factors to determine whether an accused must be re-informed of his constitutional rights after a delay in questioning," and argues that each favors suppression in his case. *Id.* at 3-7 (citing *Michigan v.*

*Mosely*, 423 U.S. 96 (1975); *United States v. Lugo Guerrero*, 524 F.3d 5, 12 (1st Cir. 2008)). Mr. Churchill acknowledges that the defendants in *Mosely* and *Lugo Guerrero* "had previously invoked their right to remain silent" but "submits the analysis should be similar whether a defendant has previously invoked or not." *Id.* at 4.[2] He notes that the Law Court applied a similar five factor *Miranda* analysis after a delay between questionings in *State v. Hopkins*, 2018 ME 100, ¶41, 189 A.3d 741, where "the defendant did not invoke her right to remain silent during her first interrogation." *Id.* He argues that "although [he] was read *Miranda* rights by [Trooper Roddy] on April 5, 2021, [he] must have been re-informed of his constitutional rights when custodial interrogation resumed on April 8, 2021," thus any "waiver of his rights with Roddy cannot be applied to any incriminating statements made three days later." *Id.* at 5.

Mr. Churchill turns to the first factor, the "time lapse between [the] last *Miranda* warnings given and the accused's statements." *Id.* Without "hard and fast rules for what constitutes too long of a delay," he explains that "the length of the delay must be considered as part of the totality of the circumstances." *Id.* Mr. Churchill emphasizes that the lapse before his interrogation here "was not hours or one day— but rather three days," which "breaks the continuity and should mandate rereading of *Miranda*." *Id.* He concludes that "so significant . . . an interruption . . . favors" suppression. *Id.* For the same reasons, Mr. Churchill insists that the second factor, "interruptions in the continuity of the interrogation," also weighs in his favor. *Id.*

---

[2]     Mr. Churchill submits that "[i]t is not clear from discovery whether [he] invoked his right to remain silent with Trooper Roddy or whether the questioning just ceased." *Id.* at 4.

Regarding the third factor, "change of location from the last *Miranda* warnings and the accused's statements," he emphasizes that the location "changed entirely" from "a police cruiser at the scene of the traffic stop" to "an interview room at the jail while [he] was handcuffed," after spending several days in custody.  *Id.* at 6.  Mr. Churchill reasons that this factor also favors suppression because his "waiver of his rights in the back of the police cruiser cannot be applied to his statements made seve[ral][3] days later in the interview room in the jail."  *Id.*

As to "whether the same officer who gave the last *Miranda* warnings also conducted the interrogation resulting in the accused's statements," Mr. Churchill contends that any waiver upon Officer Roddy's initial warnings "cannot be said to waive his rights with an entirely different officer several days later."  *Id.*  He also points to the agent's lack of "inquiry into whether [he] was fully aware of his rights from any prior readings," particularly given "the change in officers and location" and indications that he was "confused about his ability to have an attorney present at the second interrogation."  *Id.*

Finally, regarding "whether the statements elicited differed significantly from other statements that had been preceded by *Miranda* warnings," Mr. Churchill says that although his "statements to each officer may not have differed significantly, his statements to Richards were much more in depth than those previously made to Roddy."  *Id.*  He urges the Court, upon "applying the five objective indicia to the facts

---

[3]     Mr. Churchill's assertion that his statements were made "seven" days later must be a typographical error.  Mr. Churchill was pulled over by Maine State Troopers on April 5, 2021 and interrogated at the jail three days later on April 8, 2021.  *Def.'s Mot.* at 5; *Gov't's Opp'n* at 4.

of this case and the totality of the circumstances . . . to suppress any statements made by Defendant after he was in custody." *Id.* at 7.

### B.    The Government's Opposition

The Government responded in opposition, asserting that Mr. Churchill's "arguments lack merit and are unsupported by the evidence" and that he "knowingly, intelligently, and voluntarily waived his *Miranda* rights." *Gov't Opp'n* at 1, 3.  The Government recounts the totality of the circumstances test for assessing whether a *Miranda* waiver is knowing, intelligent, and voluntary, and submits that the "inquiry looks to the 'absence of police overreaching, not [] 'free choice' in any broader sense of the word.'" *Id.* at 3-4 (quoting *Colorado v. Connelly*, 479 U.S. 157, 170 (1968)).

Regarding the break in time between the roadside warnings from Trooper Roddy and the jailhouse interview with TFO Richards, the Government quotes *United States v. Hinkley*, 803 F.3d 85, 92 (1st Cir. 2015), for the proposition that *Miranda* warnings "need not be renewed every time there is a break in questioning." *Id.* at 4.  Although the "break was longer than a full day," the Government insists that it "was not so great as to suggest the effectiveness of the earlier *Miranda* warning was diminished" and moreover "[t]here is no indication that Churchill invoked any of those rights between the roadside interview and the interview at the sheriff's office." *Id.*  According to the Government, "[t]he totality of circumstances demonstrates no intimidation, coercive conduct or overreaching, or deception." *Id.*

The Government goes on to argue that "[w]here there has been no *Miranda* violation, 'only confessions procured by *coercive official tactics* should be excluded as

involuntary.'" *Id.* at 5 (quoting *United States v. Benzanson-Perkins*, 390 F.3d 34, 40 (1st Cir. 2004) (emphasis in *Benzanson-Perkins*)).  The Government lists egregious police actions that have been found to amount to coercion.  *Id.*  The Government says that as "Churchill was thirty-nine years old, with prior contacts with the criminal justice system" and his interviews lasted seven minutes and one-hour and twenty minutes respectively, "[n]othing in the circumstances . . . suggest[s] that his will was overborne or that his statements were the product of coercion."  *Id.* at 5-6.

The Government disagrees with Mr. Churchill that his statements after TFO Richards told him that asking for a lawyer was "not practical" were not a product of his free choice.  *Id.* at 6.  The Government argues that "under the *Edwards* [*v. Arizona*, 451 U.S. 477, 484-85 (1981),] rule, police officers must cease questioning once a suspect invokes his right to counsel . . . 'sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'"  *Id.* (quoting *Davis v. United States*, 512 U.S. 452, 459 (1994)).  Under this "objective inquiry," the Government says that "questioning need not cease" upon "a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel."  *Id.* at 6-7 (quoting *Davis*, 512 U.S. at 459; *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991)) (emphasis in *Gov't's Opp'n*).

As to the roadside interview, the Government reasons that "Churchill's statement ['I guess I need a lawyer,' to which Trooper Roddy responded, 'yup if you want one'] regarding an attorney is ambiguous."  *Id.* at 7 n.7.  The Government insists

that because "Churchill did not unequivocally request [that] an attorney be present during his interview with TFO Richards, [his] post-*Miranda* statements were voluntary and should not be suppressed." *Id.* at 7.

## III.   DISCUSSION

### A.   A Different Version of the Roadside Conversation and a Different and Easier Conclusion

The Government and Mr. Churchill have framed their arguments around the proposition that just after midnight on April 6, 2021, during the traffic stop, Trooper Roddy read Mr. Churchill his *Miranda* warnings while he was sitting in her cruiser, that he replied, "I guess I need a lawyer," and that Trooper Roddy answered, "Yup, if you want one."  However, when the Court listened to the recording of the encounter between Trooper Roddy and Mr. Churchill while he sat handcuffed in her cruiser, the context of the conversation was markedly different than what the Government and Mr. Churchill have presented.  The Court sets forth its understanding of the conversation and draws some conclusions.

The sound quality of Trooper Roddy's cruiser video is extremely poor, given the background noise and static, and unlike with the later jailhouse interview, the Government did not provide a transcript of this video or of the portion of the video it quoted.  However, the Court was able to hear Trooper Roddy *Mirandize* Mr. Churchill at 00:14:00 on April 6, 2021.  Mr. Churchill agreed to answer questions and Trooper Roddy proceeded to ask him about any items that he and his passenger brought into

the car, whether the black jacket in the back was his, and whether he had money in the car and where he kept it.

At 00:18:49, a male trooper comes over to Trooper Roddy's cruiser and says to Mr. Churchill: "You obviously know what we found in the car."  Mr. Churchill responds by mentioning his money, which he already told Trooper Roddy about.  The male trooper says "Yeah, and there's a ton of heroin in there too."  The male trooper continues: "What we're going to do is go back to the barracks [with Churchill and the passenger], . . . you guys are on the hook right now . . . you are under arrest."  At 00:19:08, the male trooper tells Mr. Churchill "You got quite a few fingers [of drugs] in there" and asks him who the cash and "dope" belongs to.  Mr. Churchill says he had a little bit of drugs with his money.  The male trooper laughs and says "No, there's way more than that."

At 00:20:08, the male trooper tells Mr. Churchill, "You know what that is for a crime, right?  Aggravated trafficking, for narcotics?"  Mr. Churchill repeats that the drugs weren't his.  Just after the male trooper left, Mr. Churchill said to Trooper Roddy, at 00:20:29, "I guess I need a lawyer, huh" to which Trooper Roddy replied "yup, if you want one."

Immediately after this exchange, at 00:20:50, the other troopers ask Trooper Roddy to bring them evidence bags, so she stops talking to Mr. Churchill at this point and gets out of her cruiser.  Trooper Roddy later asked Mr. Churchill if he had a phone or something he needed in his car (when the troopers were coordinating bringing the suspects in and having the car towed).  After about thirty minutes,

15

during which the troopers can be heard talking among themselves, bagging the evidence, estimating the drug weight, searching the rest of the car, and planning next steps in the arrests, at 00:50:18, a male trooper's voice can be heard asking Trooper Roddy: "The driver's still cooperating right?  He's been talking?"  At 00:50:28, Trooper Roddy replies: "Yeah but [the other male trooper] told him about aggravated trafficking, he said I probably want a lawyer."  The male trooper's response is muffled, but it sounds like he said "Yeah, they'll get the guy a lawyer."

Preliminarily, if the Court's version of the full April 6, 2021 colloquy with Trooper Roddy is correct, the suppression of these statements is a foregone conclusion.  Even if Mr. Churchill said, "I guess I need a lawyer," Trooper Roddy interpreted his comment to mean "I probably want a lawyer" in relaying it to the other trooper at the scene.  Furthermore, it appears that she broke off questioning in light of Mr. Churchill's statement, as she later explained her understanding that Mr. Churchill had been willing to answer questions until he made this statement. Finally, the other trooper's response, "Yeah, they'll get the guy a lawyer," is a reasonable reflection of the status of Mr. Churchill's right to counsel at the end of the roadside interview.

If so, the Court would have little difficulty suppressing the ensuing statements. The standard is whether a "reasonable officer in light of all the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis*, 512 U.S. at 459.  Here, fairly interpreted, Trooper Roddy understood that Mr. Churchill was invoking the right to counsel, broke off further questioning, told

16

another trooper that Mr. Churchill had invoked the right to counsel, and the other trooper affirmed that a lawyer would be provided to Mr. Churchill.  Again, if the Court is correct about a hard-to-decipher recording, the Government would be in a difficult position to argue that a reasonable trooper would have understood that Mr. Churchill was not invoking his right to counsel since it would have to argue that Trooper Roddy's roadside interpretation was unreasonable.

However, the Government did not do what the trooper said it would do. Instead of the Government providing Mr. Churchill a lawyer, Mr. Churchill was kept incommunicado over the next two and a half days.  He underwent detoxification, a process onerous enough to require a suicide suit, and he was then approached by two federal agents while still in the process of detoxification and still unrepresented. Thus, instead of honoring what the Government itself interpreted as a request for counsel, the Government breached what it understood was its own obligation to provide defense counsel to Mr. Churchill.

Neither Mr. Churchill nor the Government addressed the significance of the full interchange between the troopers and Mr. Churchill and its impact on the suppression of his later statements.  However, based on the Court's understanding of the roadside interchange, it appears the statements should be suppressed.  The rest of this opinion addresses the facts as the parties described and represented them to be on the assumption that the Government and Mr. Churchill would not have led the Court down such a complicated legal rabbit hole for no good reason and the Court has assumed the facts as presented by counsel in the remainder of the opinion.

### B.    An Overview

The Court concludes that the roadside *Miranda* warnings, read to Mr. Churchill by a state trooper in the backseat of a patrol car, were not effective several days later in an entirely different interrogation setting with a different law enforcement agency, and thus suppresses Mr. Churchill's April 8 pre-*Miranda* interrogation statements.  The Court also grants Mr. Churchill's motion to suppress his April 8 post-*Miranda* statements because, even when treating Mr. Churchill's inquiries of "I can have a lawyer here?" and "[w]hat do you mean it's not practical?," as mere requests for counsel, the federal agent's dismissive and misleading responses did not honor Mr. Churchill's Fifth Amendment right to request an attorney and stop all questioning until he can speak to one, no matter how long that takes or how impractical it may seem from law enforcement's perspective.

In *Miranda v. Arizona* the Supreme Court warned against law enforcement deception as to the nature and purpose of the right to counsel and efforts to pressure suspects against invoking their fifth amendment rights.  "When normal procedures fail to produce the needed result, the police may resort to deceptive stratagems such as giving false legal advice."  *Miranda v. Arizona*, 384 U.S. 436, 455 (1966).  "[B]y trading on [defendant's] insecurity about himself or his surroundings," the *Miranda* Court warned that "police [may try to] persuade, trick, or cajole him out of exercising his constitutional rights."  *Id.* at 454-55 (providing the example that "[i]f the request is for an attorney, the interrogator . . . may also add, 'Joe, I'm only looking for the truth, and if you're telling the truth, that's it.  You can handle this by yourself'").

Although the Supreme Court later declined in *Davis v. United States* to require law enforcement officers to ask clarifying questions of a defendant upon an equivocal request for counsel, it encourages them to do so. *See* 512 U.S. at 461 ("Clarifying questions help protect the rights of the suspect by ensuring that he gets an attorney if he wants one, and will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel"). *Id.* Here the agent did the opposite and actively discouraged Mr. Churchill from asserting his rights.

### C.    Pre-*Miranda* Jailhouse Statements

#### 1.    Legal Standard

*Miranda* warnings are required prior to any custodial interrogation. *Miranda*, 384 U.S. at 479; *United States v. Molina-Gómez*, 781 F.3d 13, 21-22 (1st Cir. 2015). The government bears the burden of proving *Miranda* compliance, *United States v. Barone*, 968 F.2d 1378, 1384 (1st Cir. 1992), and the voluntariness of a confession. *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990). Neither side disputes that Mr. Churchill was in custody at the time of his jailhouse interview, thus the issue turns on whether Mr. Churchill made the statements while subject to "interrogation." *United States v. Jackson*, 544 F.3d 351, 357 (1st Cir. 2008) (noting that "[t]he entire course of conduct of the officers must be examined to determine whether the statement was in response to unlawful questioning under *Miranda*"). "A volunteered statement is not the product of interrogation and is not subject to

suppression, even if warnings have not been provided." *Id.* (citing *Miranda*, 384 U.S. at 478).

### a.   *Miranda*'s Booking Exception

An interrogation for *Miranda* purposes includes "any words or actions on the part of the police (other than those normally attendant on arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). Under an exception to this rule, law enforcement officers may ask booking questions seeking background information, such as the "suspect's name, address, and related matters." *United States v. Sanchez*, 817 F.3d 38, 44-45 (1st Cir. 2016) (quoting *United States v. Doe*, 878 F.2d 1546, 1551 (1st Cir. 1989)). The rationale behind the booking exception is that questions of this sort "rarely elicit an incriminating response . . . even when asked after an arrest." *Id.* at 45 (quoting *Doe*, 878 F.2d at 1551).

The booking exception, however, does not extend "where the law enforcement officer, in the guise of asking for background information, seeks to elicit information that may incriminate." *Id.* (quoting *Doe*, 878 F.2d at 1551). "Ultimately, the booking exception's applicability turns on an 'objective' test that asks 'whether the questions and circumstances were such that the officer should have reasonably expected the questions to elicit an incriminating response,'— meaning 'the officer's *actual* belief or intent,' though 'relevant,' is in no way conclusive.'" *Id.* (emphasis in *Sanchez*) (first

quoting *United States v. Reyes*, 225 F.3d 71, 77 (1st Cir. 2000), then *Doe*, 878 F.2d at 1551).

### b.    Interrogation After a Break in Questioning

"*Miranda* warnings need not be renewed every time there is a break in questioning." *Hinkley*, 803 F.3d at 92. "Once an effective *Miranda* warning is administered, those warnings remain effective until the passage of time or an intervening event makes the defendant unable to fully consider the effect of a waiver." *Id.* (citing *United States v. Pruden*, 398 F.3d 241, 246-47 (3d Cir. 2005)). The First Circuit has "presume[d] that the defendant would remember the warnings even if some time has elapsed between the warning and the questioning." *Id.* (citing *United States v. Edwards*, 581 F.3d 604, 607-08 (7th Cir. 2009)).

In *Michigan v. Mosely*, 423 U.S. 96 (1975), the Supreme Court identified four factors relevant to assessing if law enforcement should have read a defendant their rights again: "(1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of *Miranda* warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect." *Lugo Guerrero*, 524 F.3d at 12 (citing *Mosely*, 423 U.S. at 104-06). The First Circuit has directed courts to "look to the totality of the circumstances," noting that "[t]he key inquiry remains whether defendant was in charge of the decision whether

and to whom he would speak." *Id.* (alteration in *Lugo Guerrero*) (quoting *United States v. Thongsophaporn*, 503 F.3d 51, 57 (1st Cir. 2007)) (internal quotation omitted).

### 2.    Analysis

The Government insists that Trooper Roddy's April 5 *Miranda* warnings remained effective upon the federal agents' resumption of questioning on April 8, and that Mr. Churchill's waiver of his rights should apply to admit his statements made before being informed of his rights a second time. *See Gov't's Opp'n* at 4. The Court agrees with Mr. Churchill that the Supreme Court's objective *Mosely* factors, as framed by the First Circuit in *Lugo Guerrero*, support his argument that he should have been reinformed of his constitutional rights before being questioned on April 8. *See Lugo Guerrero*, 524 F.3d at 12 (citing *Mosely*, 423 U.S. at 104-06). The Court also concludes that Mr. Churchill's incriminating pre-*Miranda* responses regarding his drug use, related criminal history, and the instant offense do not fall within the routine booking exception to *Miranda*.

### a.    The Break in Questioning

In assessing whether earlier *Miranda* warnings are sufficient to allow later un-*Mirandized* questioning, the First Circuit in *Lugo Guerrero* reiterated the Supreme Court's four *Mosely* factors:

> (1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same officer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of *Miranda* warnings before the subsequent

interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect.

*Lugo Guerrero*, 524 F.3d at 12 (citing *Mosely*, 423 U.S. at 104-06). The Court addresses each factor in turn and assesses the "'totality of the circumstances' with an eye to determining whether the suspect retained the ability to choose whether and when to speak." *United States v. Oquendo-Rivas*, 750 F.3d 12, 18 (1st Cir. 2014) (quoting *Thongsophaporn*, 503 F.3d at 57).

Regarding the time between the *Miranda* warnings and the subsequent un-*Mirandized* questioning, the First Circuit has declined to establish a temporal rule applicable to all cases. In *United States v. Oquendo-Rivas*, the First Circuit explained that "[i]t would be both unwise and unworkable . . . to try and demarcate a one-time-fits-all limit for assessing reasonableness [of a break in questioning], which at its worst might only send interrogating officers running for their stopwatches." *Id.* at 18 (noting that "[s]uch a reading of *Mosley* has been previously rejected by our court") (citing *United States v. Barone*, 968 F.2d 1378, 1383 (1st Cir. 1992)).

Although there is no precise test for how long is too long, here the nearly two-and-a-half days between Trooper Roddy's roadside warnings and TFO Richards' jailhouse interrogation represent a significantly longer stretch than the breaks found permissible in the cases cited by the Government.[4] In its responsive memorandum,

---

[4]     Mr. Churchill references a three-day break in questioning, but the lapse was actually under two-and-a-half days. Following the traffic stop at approximately 11:30 pm on April 5, 2021, Trooper Roddy read Mr. Churchill his Miranda rights at approximately 1:14 am on April 6, 2021. *Cruiser Video*; *Gov't's Opp'n* at 2 n.1. On April 8, 2021, the federal agents arrived at the Kennebec County Sheriff's Department at approximately 8:40 am, after which Mr. Churchill was brought from the jail to the detectives bureau interview room. *Gov't's Opp'n* at 2.

the Government cites two cases in which courts held that a break in questioning did not make earlier *Miranda* warnings ineffective.  *Gov't's Opp'n* at 4 (citing *Hinkley*, 803 F.3d at 92; *United States v. Nguyen*, 608 F.3d 368, 375 (8th Cir. 2010)).

In *Hinkley*, less than twenty-four hours had passed since the first set of warnings, and the defendant "acknowledged . . . that he remembered the [first] warnings, remained familiar with them, and did not need them repeated."  803 F.3d at 92.  The *Hinkley* Court noted:

> Miranda warnings need not be renewed every time there is a break in questioning.  Once an effective Miranda warning is administered, those warnings remain effective until the passage of time or an intervening event makes the defendant unable to fully consider the effect of a waiver.

*Id.*  The First Circuit found "no indication that the passage of time was long enough to make Hinkley's second waiver involuntary."  *Id.* (citing *Nguyen*, 608 F.3d at 375).

In *Nguyen*, the Eighth Circuit addressed a case where a defendant was questioned one full day after agents had read him his full rights.  *Nguyen*, 608 F.3d at 374 ("[A] full day passed between the time agents read him his full rights and the time he was questioned").  Acknowledging that "[t]he determination of whether a defendant has knowingly and voluntarily waived his Miranda rights is an extremely fact sensitive analysis," the Eighth Circuit focused on the length of time after the full *Miranda* warning, the defendant's "extensive experience with the criminal justice system," the fact that the agents reminded the defendant of his rights at the subsequent interrogations, and the defendant acknowledgement at both subsequent interviews that he remembered and understood his rights.  *Id.* at 374-75.  The Court

views *Hinkley* and *Nguyen* as equivocal support for admissibility of Mr. Churchill's statements on the facts in this case.

In its own research, the Court has found decisions approving extended periods between the original warning and subsequent questioning. *See Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir. 1975) (statements made approximately two weeks after *Miranda* warnings were deemed voluntary); *United States v. Daulton*, 488 F.2d 524, 525 (5th Cir. 1973) (*Miranda* warnings given thirteen days before confession were sufficient when the court concluded that the defendant was still "aware of his entitlement to counsel"); *Martin v. Wainwright*, 770 F.2d 918, 929-31 (11th Cir. 1985) (upholding *Miranda* warnings given approximately one week prior to questioning); *United States v. Clay*, 408 F.3d 214, 222 (5th Cir. 2005) (statement given two days before questioning upheld); *Guam v. Dela Pena*, 72 F.3d 767, 770 (9th Cir. 1995) (statement given fifteen hours after *Miranda* warning admissible); *Puplampu v. United States*, 422 F.2d 870, 870 (9th Cir. 1970) (questioning two days after *Miranda* warnings upheld).

By contrast, in *United States v. Pruden*, 398 F.3d 241 (3d Cir. 2005), the Third Circuit described a twenty-hour delay between the initial warning and subsequent questioning as being "at the upper end of the permissible range." *Id.* at 247. As the Seventh Circuit pointed out in *United States v. Edwards*, 581 F.3d 604 (7th Cir. 2009), the issue is not so much one of staleness, or "whether the 'totality of the circumstances' indicates that the inculpatory statement was made knowingly" but "whether the defendant when he gave the statement didn't realize he had a right to

remain silent." *Id.* at 607.  In *Pruden*, the Third Circuit quoted two key questions posed by a district court judge: "(1) At the time the *Miranda* warnings were provided, did the defendant know and understand his rights? (2) Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?"  398 F.3d at 246-47 (quoting *United States v. Vasquez*, 889 F. Supp. 171, 177 (M.D. Pa. 1995)).

The Court turns to the totality of the circumstances on the assumption that a two-and-one-half day interval between the time Mr. Churchill was given the *Miranda* warnings and the time he was questioned without the warnings suggests, but not conclusively, that agents should have given him a second warning before the second round of questions.

Here, there are several significant factors.  They include: (1) the circumstances of the initial *Miranda* warning, (2) the nature of the initial questioning, (3) Mr. Churchill's personal exposure to the criminal justice system, (4) whether the same law enforcement unit and officers did the questioning on both occasions, (5) the circumstances of the second interview, and (6) any indication that Mr. Churchill did

not understand his rights at the second interview before the *Miranda* warnings were given.

### b.   The Initial *Miranda* Warning: April 6, 2021

Trooper Harrington pulled Mr. Churchill over at 11:29 p.m. on April 5, 2021 in Gardiner, Maine.  *Trooper Harrington Report* at 1.  Trooper Harrington asked Mr. Churchill where he was heading and he stated back home to Bangor, Maine.  *Id.* at 2.  Trooper Harrington then asked Mr. Churchill where he was coming from and Mr. Churchill pointed north and said, "Methuen."  *Id.*  He told Trooper Harrington that he had gone to Methuen, Massachusetts to pick up a friend, Juanito, and was on his way to drop Juanito off in Brewer to visit family.  *Id.*  Because it was drizzling, Trooper Harrington suggested that they take a seat in his cruiser and Mr. Churchill agreed to do so.  *Id.*

While in Trooper Harrington's cruiser, Mr. Churchill told Trooper Harrington his name and, when asked whether he had been in trouble with the police before, Mr. Churchill explained, "a couple of OUIs back in the day."  *Id.*  Mr. Churchill told Trooper Harrington that he had left Bangor earlier that day and traveled to Methuen to pick up Juanito.  *Id.*  Mr. Churchill initially told Trooper Harrington that a friend of his – "some guy I know in Bangor, Maine" – had given him $80 for gas and $60 in addition to drive to Methuen and pick up Juanito.  *Id.*  Mr. Churchill said that he was currently living out of his car and he would do things like this for money.  *Id.*  Mr.

Churchill then said he was being paid by a member of Juanito's family to bring him to Maine.  *Id.*

Trooper Harrington noted in his report that Mr. Churchill's change of story, from a friend of his to a member of Juanito's family (Trooper Harrington thought that Mr. Churchill was talking about two different people) was due to the fact that Mr. Churchill was having "a hard time remembering the story he initially told me about who was compensating him for his travel." *Id.* at 2-3.  The Trooper also noted that the trip from Bangor to Methuen and back would have taken six hours and twenty minutes. *Id.* at 3.  The Court concludes that Mr. Churchill had been driving that day for approximately five hours when he was pulled over in Gardiner, Maine.

 Trooper Harrington told Mr. Churchill that he was having a hard time believing him, and pointed out that Methuen was a "high drug area." *Id.*  Mr. Churchill quickly stated that it was not Methuen, but Salem, Massachusetts, where he had picked up Juanito.  *Id.*  During his discussion with Mr. Churchill, Trooper Harrington observed that Mr. Churchill had become visibly nervous with "sweat starting to collect on [his] forehead." *Id.*  In addition, Mr. Churchill admitted to Trooper Harrington that he had used methamphetamine that very morning. *Id.*

Mr. Churchill said his exposure to the criminal justice system was limited.  He had "a couple of OUIs back in the day" and he had been arrested for possession of a small amount of methamphetamine and fentanyl the year before. *Id.* at 2-3.  Trooper Harrington told Mr. Churchill that if there was a small amount of drugs in the car,

he was not planning on taking him to jail that night and would issue him a summons. *Id.* at 3.  He then placed Mr. Churchill in handcuffs in his cruiser.  *Id.*

As the focus of the investigation turned to Juanito, Trooper Harrington asked Trooper Roddy if he could place Mr. Churchill in her cruiser while he spoke with Juanito, and she agreed.  *Trooper Roddy Report* at 1.  After the troopers and Corporal Record discovered "a large quantity of narcotics in the backseat of the [Churchill] vehicle," Trooper Roddy returned to her cruiser and read Mr. Churchill the *Miranda* warnings.  *Id.*  As noted earlier, the Government represents that after Trooper Roddy gave Mr. Churchill the *Miranda* warnings, another trooper reported that they had found a substantial quantity of drugs and Mr. Churchill stated, "'I guess I need a lawyer,' to which Trooper Roddy responded, 'yup if you want one.'"  *Gov't's Opp'n* at 7 n.7.

Although the timing of Trooper Roddy's questioning in relation to when Mr. Churchill told her about the black sweatshirt is not clear in her report, she indicates that she asked Mr. Churchill one question: whose black sweatshirt was inside the vehicle.  *Trooper Roddy Report* at 1.  Mr. Churchill admitted that the sweatshirt was his.  *Id.*  Trooper Roddy told Mr. Churchill that "a scale [had been] found inside the sweatshirt which was used for measuring narcotics."  *Id.*  There is no other indication in Trooper Roddy's report of any other interrogation.  Trooper Harrington's report confirms that both Juanito and Mr. Churchill were transported to Kennebec County

Jail where they were charged with Aggravated Trafficking Fentanyl, a violation of 17-A M.R.S. § 1105-A(1).

The circumstances of the first *Miranda* warning leave the Court with substantial doubts about the effectiveness of the warning. As becomes even clearer from further evidence, Mr. Churchill was addicted to narcotics on April 5, 2021 and had taken methamphetamine that very morning. There is no direct evidence of the impact that his narcotics addiction and use had on his mental state late on the night of April 5, 2021, but it is likely he was still feeling the effects of methamphetamine or perhaps experiencing withdrawal. That Mr. Churchill was not quite himself is substantiated by his pointing north to indicate where he was coming from, when he was heading north, by his inability to recall his story about who had paid for the trip within moments of telling it to Trooper Harrington, by his switching the city where he had picked up Juanito from Methuen to Salem, and by his extreme nervousness, evidenced by sweat on his forehead. Also, Trooper Harrington had told Mr. Churchill that he would probably just summons him if they found a small amount of drugs in the car, although it appears that the troopers had discovered a substantial cache of drugs in the car. The record does not reveal whether Mr. Churchill knew that the troopers had discovered the cache of drugs before Trooper Roddy *Mirandized* him and, therefore, whether he thought that the troopers would let him off with a summons or whether he would be transported to jail.

Furthermore, there is nothing about Trooper Roddy's interview of Mr. Churchill that would confirm he was particularly lucid. According to her report, she

asked him only one question, namely who owned a sweatshirt the troopers had found in his car, and he admitted that he owned it.  On balance, on this record, the Court finds that evidence of the effectiveness of the *Miranda* warning is equivocal.

### c.    The Second Interview: April 8, 2021 Up to the *Miranda* Warning

The second interview took place at the interview room of the Kennebec County Sheriff's Office about two-and-one-half days later.  Jonathan Richards from the DEA and Steven Morrill of Homeland Security were the agents present at the questioning.  Mr. Churchill was dressed in a "turtle suit."[5]

At the outset of the interview, after TFO Richards and Agent Morrill introduced themselves, TFO Richards mentioned to Mr. Churchill that he was "probably in a situation you never expected to be in."  *Interview Tr.* at 2:11-14.  Mr. Churchill replied, "I didn't know what I was getting myself into."  *Id.* at 2:15.  TFO Richards then said:

> Right.  So what we want to do is we want to take a couple of minutes, you know, get you to kind of know us a little bit, answer any questions that you might have about us, about the case that we have or is being

---

[5]      Mr. Churchill's memorandum says he was wearing a "turtle suit" but does not define it.  *See Def.'s Mot.* at 2.  The videotape shows Mr. Churchill was not dressed in a typical prison jumpsuit.  Instead, he is in a long black sleeveless collarless smock that extends almost to his feet.  He is wearing pants under the smock.  *See Interview Video.*  He has handcuffs and leg cuffs on.

Wikipedia defines a "turtle suit" as "[a]n anti-suicide smock . . ., a tear-resistant single-piece outer garment that is generally used to prevent a[n] . . . incarcerated . . . individual from forming a noose with the garment to die by suicide.  The smock is typically a simple, sturdily quilted, collarless, sleeveless gown with adjustable openings at the shoulders and down the front that are closed with nylon hook-and-loop or similar fasteners."  *See Anti-suicide Smock,* https://en.wikipedia.org/wiki/Anti-suicide_smock.  This definition is consistent with the Court's observation of what Mr. Churchill was wearing during this interview.

built against you, you and the person that was in the vehicle with you. That's kind of where we are with that.

Before we get into too much of the questions, we have to read you your rights and we have to do that because of a couple of reasons, and mostly because you're in custody, and we want you to be fully aware of what's going on with us. Okay?

*Id.* at 2:16-3:2. But TFO Richards does not read Mr. Churchill his rights at that point.

TFO Richards then confirms to Mr. Churchill that Juanito had been released and says, "that has to be kind of a kick in the balls." *Id.* at 3:11-14. Mr. Churchill replies, "It is." *Id.* at 3:15. When TFO Richards tells him that the law enforcement officers are "not your enemy" and are "not going to make this worse for you," Mr. Churchill replies, "I mean, I'm facing 30 years here." *Id.* at 3:16-20. TFO Richards agrees that Mr. Churchill is "looking at a pile of time." *Id.* at 3:21. Mr. Churchill volunteers, "I was a good kid." *Id.* at 3:22. TFO Richards told Mr. Churchill that "the sad fact is you're the only one still in custody." *Id.* at 4:9-12. Mr. Churchill interrupts and says, "I don't know how that's possible." *Id.* at 4:13.

After confirming his name and date of birth and being asked his address, Mr. Churchill says, "I mean, I haven't even talked to my family." *Id.* at 4:24. TFO Richards asks whether he has tried to do so, and Mr. Churchill says, "I have tried." *Id.* at 4:25-5:1. TFO Richards promises to "reach out to them so that they can know

what's going on." *Id.* at 5:2-5.  TFO Richards offers to let Mr. Churchill use the TFO's cellphone "[b]efore we get done today." *Id.* at 5:5-7.

TFO Richards then questions Mr. Churchill about his criminal history and Mr. Churchill confirms that he has a "bunch of small stuff," that it is "drug related," that he has "a lot of drug history," and that he is not a felon. *Id.* at 6:2-13.

Turning to his drug history, Mr. Churchill agreed with TFO Richards' suggestion that he has been "a pretty regular user" and said that his drugs of choice are fentanyl and heroin. *Id.* at 6:16-24.  However, he said he had "never shot up" but had snorted or smoked it. *Id.* at 6:25-7:4.  Mr. Churchill also admitted that he had not been clean before his arrest and when TFO Richards commented that he must have been "having a bit of time with that," Mr. Churchill agreed. *Id.* at 7:8-13.  Mr. Churchill agreed that the jail had "probably" put him on suicide watch because they were concerned about his health. *Id.* at 7:14-16.

Mr. Churchill then said: "I feel as if I am not being treated fairly." *Id.* at 7:18. TFO Richards assured him that they were there "to talk to you to see what we can do and make your life better and see what you can do to help yourself out," and he also told Mr. Churchill that if he thought he was going to be "dope sick," there was a "trash can right there and just feel free to do that." *Id.* at 7:19-8:3.  Mr. Churchill replied: "It just seems so surreal." *Id.* at 8:7.

After obtaining Mr. Churchill's mother's telephone number and discussing the whereabouts of Mr. Churchill's cellphone, TFO Richards again refers to reading Mr. Churchill his rights and says "this is a good point - - this is a good time to have any

open-ended discussion that you want." *Id.* at 9:21-25.  TFO Richards assures Mr.

Churchill that "we're not lying to you and we're not trying to beat you up or convince

you of something that's not true." *Id.* at 10:1-3.  TFO Richards says, "This has to be

kind of on you and . . .." *Id.* at 10:3.  Mr. Churchill interrupts and the following

interchange takes place:

> Kristopher Churchill: I don't know.  I don't know.
>
> TFO Richards: All right. So - -
>
> Kristopher Churchill: I don't know what's happening.
>
> TFO Richards: Well –
>
> Kristopher Churchill: What's the schedule?
>
> TFO Richards: Okay.  Well, the schedule right now is we are going to do this conversation here today, right?  You seem as though you may be in a position where you may want to try to figure out what's going on and how you can maybe help yourself a little bit because you're kind of in a pickle, but we don't know that.  So our goal is today to sit down and talk to you about what you know, who you know, if you want to do that, and how you got into this situation.  And we'll build from there because I wasn't at the traffic stop.  I met you three [minutes] ago, Steve and I did, and that's kind of where we are to try to sort things out, you know what I mean?

*Id.* at 10:4-21.

TFO Richards asked whether his parents had the resources to meet his bail of

$25,000 and Mr. Churchill responded, "hopefully."  *Id.* at 11:3-5.  He also asked

whether they understood his drug use situation and Mr. Churchill replied, "to some

degree." *Id.* at 11:6-8.  Mr. Churchill volunteered that his mother and stepfather had

kicked him out of the house in the winter.  *Id.* at 11:6-12.  Mr. Churchill told TFO Richards that he has been homeless and living in his car.  *Id.* at 11:13-16.

After confirming that the car he was in at the time of his arrest was his car, Mr. Churchill asked "[Is] that ever going to get back to me?"  *Id.* at 11:17-21.  TFO Richards said that he and Agent Morrill should be able to figure out the status of his vehicle with the car wrecker service.  *Id.* at 11:22-12:20.  At that point, TFO Richards and Mr. Churchill had the following interchange:

> TFO Richards: And I don't want you to make too many incriminating statements until I read you your rights and you understand those, and you can ask me questions and I can ask you questions, however you want –
>
> Kristopher Churchill: [It's not going to matter anyway.][6]
>
> TFO Richards: Well, what do you mean? Of course, it does.  The only person in charge of your destiny right now is you, right - - in reality.  The

---

[6]     The transcript says that Mr. Churchill's statement is "inaudible," but the Court was able to clearly hear it.  *Interview Tr.* at 13:7; *Interview Video* (approximately twelve minutes and ten seconds into the interview).

way the - - the way the federal system works is this, they look at people accepting responsibility as a big deal.

Kristopher Churchill: Absolutely.  I know.

TFO Richards: But that's the way - - I'm sure that's the way your parents were.  That's the way most everything is, you know, owning up.

Kristopher Churchill: I'll own up to it.

TFO Richards: So - - but before we do all of that, like I said - -

Kristopher Churchill: I really fucked it up.

TFO Richards: Yeah, but you know - -

Kristopher Churchill: I didn't know what I was getting myself into.  I didn't know it was such a serious thing.

*Id.* at 13:2-22.  At this point, TFO Richards read *Miranda* warnings to Mr. Churchill. *Id.* at 14:12-16.  Viewing the video of the interview, the Court has determined that TFO Richards gave the *Miranda* warnings thirteen minutes and seventeen seconds into the interview.

### d.   The Totality of the Circumstances

The Court turns to the second *Pruden* inquiry: "Did anything occur between the warnings and the statement, whether the passage of time or other intervening event, which rendered the defendant unable to consider fully and properly the effect of an exercise or waiver of those rights before making a statement to law enforcement officers?"  *Pruden*, 398 F.3d at 246-47.  Based on the totality of the circumstances, the

Court concludes that the roadside *Miranda* warning was not effective as to Mr. Churchill's pre-*Miranda* statements on April 8, 2021 at the Kennebec County Jail.

The Court bases its conclusion on several factors. First, the Court previously described its concern about whether the initial roadside *Miranda* warning was effective because the circumstances of the first *Miranda* warning have a bearing on whether it was effective for a later statement. Second, the Court has considered the length of time—about two-and-a-half days—from the first warning to the second statement. Third, the Court has considered the fact that the law enforcement officers were entirely different from the initial warning to the second statement. The first warning was done by a Maine State Trooper and the second statement was taken by a federal DEA agent and HSI agent. Fourth, the Court has considered that the first warning was given at the roadside in a trooper's cruiser shortly after the traffic stop and the second statement was taken at the interview room of the Kennebec County Jail. Fifth, the Court has considered that Mr. Churchill had been going through drug withdrawals from April 5 to April 8. In fact, TFO Richards was concerned enough about whether he was "dope sick" to point out the trash can if Mr. Churchill felt sick. Sixth, the Court has considered the state charge that occasioned the arrest, a potential violation of 17-A M.R.S. § 1105-A(1), Aggravated Fentanyl Trafficking.[7]

---

[7]      The police report references section 1105-A(1) of title 17-A of the Maine revised statutes. *Trooper Harrington Report* at 5. This reference seems to be in error. Section 1105-A(1)(M) of title 17-A applies to a person who traffics in a schedule W drug in aggravating circumstances, including six grams or more of fentanyl. 17-A M.R.S. § 1105-A(1)(M). Here, law enforcement located 1496 grams of fentanyl and $3,200 in United States currency. *Trooper Harrington Report* at 4. The violation of this section is a Class A crime in Maine and subjects the person to a term of incarceration of not more than thirty years. *See* 17-A M.R.S. § 1604(1)(A). This is presumably where Mr. Churchill got the information for his statement to TFO Richards and Agent Morrill that he understood he was facing thirty years of incarceration. *Interview Tr.* at 3:20 ("I mean, I'm facing 30 years here").

Seventh, the Court has considered the fact that the investigation had been transferred from state to federal authorities. Eighth, the Court has considered that TFO Richards himself acknowledged that he was required to give Mr. Churchill a new set of *Miranda* warnings but failed to do so until over thirteen minutes into the interview. Nineth, during the pre-*Miranda* portion of the interview, Mr. Churchill repeatedly expressed confusion and concern about his situation. *See e.g., Interview Tr.* at 10:6. ("I don't know what's happening"). Tenth, during the pre-*Miranda* portion of the interview, Mr. Churchill at times seemed visibly upset. Eleventh, Mr. Churchill had not been able to communicate with his own family and had not been able to let them know he had been arrested, leaving him isolated. Twelfth, Mr. Churchill knew that Juanito, the passenger, who likely was the supplier of the fentanyl, had been released and that the focus of law enforcement's investigation had turned to him alone.

Based on the totality of the circumstances, the Court concludes that although Mr. Churchill was read his *Miranda* rights by Trooper Roddy on April 5, 2021, he must have been re-informed of his constitutional rights when custodial interrogation resumed on April 8, 2021. Unless Mr. Churchill's incriminating statements (regarding his drug use, criminal history, and the circumstances of the traffic stop)

made before TFO Richards reread him his rights fall within an exception to *Miranda*, they must be suppressed.

### e.      The Applicability of the Booking Exception

The Court turns to whether TFO Richards' initial questioning of Mr. Churchill fits under the routine booking exception to *Miranda* so as to admit Mr. Churchill's statements made before he was properly reread his rights.  At the beginning of the interrogation, TFO Richards explained to Mr. Churchill that he wanted to "figure out a little bit about [him]," stressing that the agents were "trying to get to the bottom of this and right now, the sad fact is you're the only one still in custody."  *Id.* at 3:25 to 4:1-12.   After  briefly  asking  Mr.  Churchill  about  his  date  of  birth,  address,  and current living situation, TFO Richards asked Mr. Churchill "[w]hat do you have for criminal history?  Do you have a bunch of stuff in your background?"  *Id.* at 6:2-4. After Mr. Churchill told him he had "a bunch of small stuff. . . drug-related stuff" and "a lot of drug history" but no drug felonies, TFO Richards asked "[w]ould it be a safe assumption that you're a pretty regular user and have been for a while and that may be a part of the problem with your – history?"  *Id.* at 6:5-20.  Mr. Churchill said yes, and TFO Richards went on to ask him about his "drug of choice" and whether he was "clean prior to [his] arrest."  *Id.* at 6:21-25, 7:8-9.  Reasoning that Mr. Churchill's arrest "forced [him] to get cleaned up a little bit," TFO Richards asked him about his health and being placed on suicide watch before again reminding Mr. Churchill that "we're just here on a fishing expedition to try to put things together" and "right now

you know where you are and you know where your co-defendant is." *Id.* at 7:10-7:25, 8:23-25.

After Mr. Churchill asked about making a call to his family, about "the schedule" for next steps, and what was going to happen to his car and its contents, saying "[t]hat money was mine . . . I saved up," TFO Richards said "[b]efore we get into the money and things like that . . . I don't want you to make too many incriminating statements until I read you your rights and you understand those[.]" *Id.* at 10:6-21, 12:21 to 13:1-4.  TFO Richards went on to emphasize to Mr. Churchill that he was "the only person in charge of [his] destiny right now" and that "the way the federal system works is [] they look at people accepting responsibility as a big deal."  *Id.* at 13:8-12.  TFO Richards said to Mr. Churchill "I'm sure that's the way your parents were.  That's the way most everything is, you know, owning up."  *Id.* at 13:14-16.  Mr. Churchill responded, "I'll own up to it" and "I really fucked it up" and "I didn't know what I was getting myself into.  I didn't know it was such a serious thing."  *Id.* at 13:18-22.

TFO Richards' inquiries about Mr. Churchill's drug use and "owning up" to his involvement in drug trafficking were not the kind of benign questions to which *Miranda*'s routine booking exception was intended to apply.  *Compare United States v. Vicente*, No. 1:16-cr-77-JAW, 2017 U.S. Dist. LEXIS 59430, *15 (D. Me. Apr. 19, 2017) (concluding that "given all of the circumstances revealed in this record . . . the question of whether [defendant] 'took any drugs' was an interrogation" and suppressing the defendant's response that he has a heroin addiction and takes one to

two grams of heroin per day), *with Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (holding that questions concerning a suspect's name, address, height, weight, eye color, date of birth, and current age fell within the routine booking exception because they collect "biographical data necessary to complete booking or pretrial services").

Moreover, if TFO Richards were merely asking questions to elicit routine booking information, he should not have framed the exchange by first making sure that Mr. Churchill knew "that the person that was in the vehicle with [him] ha[d] been released," implying things were looking bad for Mr. Churchill unless he started talking. *Id.* at 3:11-14. After Mr. Churchill confirmed he already knew he was the only suspect left, TFO Richards went on to emphasize that "[Mr. Churchill] was the only person that can take care of [himself] at this point," reminding him that he was "looking at a pile of time," but that the agents "are not going to make this worse for [him]." *Id.* at 3:16-19. From the beginning of the interrogation, TFO Richards' inquiries and comments were linked to the suspected criminal activity and targeted Mr. Churchill's uniquely vulnerable position. The "owning up" prompt was not part of a routine or standard non-investigatory procedure and TFO Richards could have reasonably expected it to elicit an incriminating response. *See Sanchez*, 817 F.3d at 45-46; *Reyes*, 225 F.3d at 77.

Moreover, although the officer's actual subjective intent is not dispositive, TFO Richards explicitly acknowledged at the outset that "[b]efore we get into too much of the questions, we have to read you your rights . . . mostly because you're in custody and we want you to be fully aware of what's going on with us." *Interview Tr.* at 2:23

to 3:2.  Shortly before he read Mr. Churchill his rights, slightly more than thirteen minutes into the interview, TFO Richards again acknowledged that Mr. Churchill shouldn't "make too many incriminating statements until [he] read him his rights." *Id.* at 13:2-6; *see Sanchez*, 817 F.3d at 45.  Under the ultimately objective test, TFO Richards "should reasonably have expected the [drug use] question[s] to elicit an incriminating response."  *See Reyes*, 225 F.3d at 77; *Vicente*, 2017 U.S. Dist. LEXIS 59430, at *14 (likening the defendant's situation, in being asked "question[s] about drugs . . . by DEA agents investigating a drug conspiracy," to one "in which the routine booking exception did not apply because the questions related to the suspected charges") (citing *Doe*, 878 F.2d at 1551-52 ("holding that a question about citizenship on high seas of person present on foreign vessel with drugs is reasonably likely to elicit incriminating response")).  Mr. Churchill had already been charged with aggravated fentanyl trafficking, so this was certainly not "a case where the inquiring officers had no reason to know that the [drug use] question was even tangentially related to an issue in the investigation." *Vicente*, 2017 U.S. Dist. LEXIS 59430, at *14.  The Court concludes that *Miranda*'s routine booking exception does not apply to Mr. Churchill's incriminatory statements regarding his drug use, related criminal

history, and the circumstances of the traffic stop and thus suppresses those statements.

### D.    Post-*Miranda* Jailhouse Statements

#### 1.    Legal Standard

"The Fifth Amendment right against self-incrimination prohibits courts from admitting into evidence a defendant's involuntary confession." *United States v. Jacques*, 744 F.3d 804, 809 (1st Cir. 2014). "In assessing whether a confession is voluntary, courts must inquire 'whether the will of the defendant had been overborne so that the statement was not his free and voluntary act.'" *Id.* (quoting *Bryant v. Vose*, 785 F.2d 364, 367-68 (1st Cir. 1986)).

The First Circuit's assessment of voluntariness considers "the totality of the circumstances, including both the nature of the police activity and the defendant's situation." *United States v. Hughes*, 640 F.3d 428, 438 (1st Cir. 2011). "Relevant considerations include the length and nature of the questioning, promises or threats made by investigators, and any deprivation of the suspect's essential needs." *Jacques*, 744 F.3d at 809. "They also include the defendant's personal circumstances, including his age, education, intelligence, and mental condition, as well as his prior experience with the criminal justice system." *Id.* (internal citation omitted). "A defendant's calm demeanor and the lucidity of his statements weigh in favor of

finding his confession voluntary." *Id.* (citing *United States v. Rojas-Tapia*, 446 F.3d 1, 8 (1st Cir. 2006)).

If a defendant voluntarily makes statements after being informed of their Fifth Amendment right to counsel, "waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards*, 451 U.S. at 482 (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *see also United States v. Jackson*, 918 F.2d 236, 242 (1st Cir. 1990) ("Congress and the courts have indicated that to determine voluntariness it is necessary to look at the totality of the circumstances, *including* any promises or threats made by police officers or the prosecution, in order to see whether the will of the accused was overborne") (emphasis in original).

"[I]f a suspect requests counsel at any time during the interview, he is not subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Davis*, 512 U.S. at 458 (citing *Edwards*, 451 U.S. at 484-85). "This 'second layer of prophylaxis for the *Miranda* right to counsel,'" *id.* (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 176 (1991)), is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Id.* (quoting *Michigan v. Harvey*, 494 U.S. 344, 350 (1990)).

Although the Supreme Court has declined to adopt a rule requiring law enforcement to ask clarifying questions "[w]hen a suspect makes an ambiguous or

equivocal" request for counsel, it explained that "it will often be good police practice for the interviewing officers to clarify whether or not [the suspect] actually wants an attorney." *Davis*, 512 U.S. at 461. "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." *Id.* at 461-62.

### 2.   Analysis

The Government argues that absent a *Miranda* violation, "only confessions procured by coercive official tactics should be excluded as involuntary." *Gov't's Opp'n* at 5 (emphasis omitted). The Government insists that Mr. Churchill did not unequivocally request that an attorney be present during his interview with TFO Richards, and thus his voluntary post-*Miranda* statements should not be suppressed. *Id.* at 7.

The Court agrees with the Government that Mr. Churchill's question, "I can have a lawyer here?," is not an unequivocal demand for counsel and under *Davis* and its First Circuit progeny, it would not qualify as the invocation of the right to counsel. *See Davis*, 512 U.S. at 459 ("[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning") (emphasis in original); *United States v. Carpentino*, 948 F.3d 10, 23-24 (1st Cir. 2020). In *Obershaw v. Lanman*, 453 F.3d 56 (1st Cir. 2006), the First Circuit addressed a similar question from a suspect. Mark Obershaw had begun to cooperate in a murder investigation,

but when the police asked him to take them to the body, he asked, "Can I talk to a lawyer first?" *Id.* at 58.  The *Obershaw* Court wrote that "Obershaw inquired whether he could talk to a lawyer, rather than expressly asserting that he in fact wanted to do so." *Id.* at 65.  In the Court's view, based on First Circuit authority, merely by asking if he could have a lawyer, Mr. Churchill did not "clearly and unambiguously request the assistance of counsel." *Carpentino*, 948 F.3d at 24.

But this conclusion does not end the discussion.  The issue here is not what Mr. Churchill said, but what TFO Richards said in response.  In *Obershaw*, when Mark Obershaw asked his question, the police responded that "he could use the telephone to call a lawyer." *Obershaw*, 453 F.3d at 58.  Mr. Obershaw then retracted his inquiry and said that he did not want to talk to a lawyer. *Id.*

When TFO Richards advised Mr. Churchill of his "absolute right to the advice of a lawyer before any questioning and to the presence of a lawyer with [him] during questioning," Mr. Churchill responded, "I can have a lawyer here?" *Interview Tr.* at 14:18-21.  TFO Richards told him "[y]ou can ask for a lawyer.  It's not practical.  They're not going to able to get here today, right?  But we can stop until you get an attorney.  That is one of your rights." *Id.* at 14:22-25.  Mr. Churchill responded "[w]hat do you mean it's not practical?" to which TFO Richards replied "[w]ell . . . it's just not.  But your options are to wait until you talk to an attorney, if you wanted to." *Id.* at 15:1-4.  Mr. Churchill said "[n]o," before TFO Richards explained "[i]f you

cannot afford a lawyer, one will be furnished to you free before any questioning, if you desire," and asked him if he understood.  *Id.* at 15:5-9.

The interview transcript reflects that in the thirteen minutes before TFO Richards gave the *Miranda* warnings, he repeatedly told Mr. Churchill that the agents could be trusted and would not lie to him.  *Id.* at 3:3-6 ("The one thing that Steve and I will both tell you is through this whole thing today, you may hear something that you don't like but what you won't hear is a lie.  We don't lie to people"); 3:18-19 ("We're not your enemy.  We are not going to make this worse for you"); 7:21-24 ("[W]e're here to talk to you to see what we can do and make your life better and see what you can do to help yourself out and that sort of stuff").  TFO Richards also offered to assist Mr. Churchill by putting him in touch with his family and by contacting the towing service to secure his rights to his car, which was Mr. Churchill's home at the time.  *Id.* at 5:2-13, 11:22-12:20.  Thus, when TFO Richards told Mr. Churchill that it would not be practical for him to request a lawyer, he had already established his credibility and his potential helpfulness to Mr. Churchill and, taking TFO Richards at his word, Mr. Churchill had good reason to rely on his advice.

The Court agrees that TFO Richards' response was ambiguous.  TFO Richards did inform Mr. Churchill that "we can stop until you get an attorney.  That is one of your rights."  *Id.* at 14:24-25.  But TFO Richards prefaced that by telling Mr. Churchill that a request for a lawyer was "not practical" because a lawyer was "not going to be able to get here today."  *Id.* at 14:22-23.  Mr. Churchill asked, "What do you mean it's not practical?"  *Id.* at 15:1.  TFO Richards replied, "Well, it just - - it's

just not." *Id.* at 15:2.  TFO Richards then said that one of Mr. Churchill's options was "to wait until you talk to an attorney, if you wanted to." *Id.* at 15:2-4.  Mr. Churchill agreed to go forward with the interview without counsel. *Id.* at 15:2-5, 16:18 ("Let's talk").

The case is a close one because of TFO Richards' intermingling of conflicting advice to Mr. Churchill: Mr. Churchill's right to counsel and the impracticality of exercising that right.  On balance, the Court concludes that the totality of the circumstances requires the Court to suppress Mr. Churchill's statements to law enforcement even after the second *Miranda* warning.  In this ruling, the Court has taken into account all the factors discussed earlier, including Mr. Churchill having gone through (and likely still going through) narcotic withdrawal, his vulnerable emotional state, his being dressed in an anti-suicide smock, his inability to, at that point, talk to his family despite two-and-a-half days of incarceration, his worry about the status of his vehicle, in which he had been living, TFO Richards' earlier encouragement to have an "open-ended discussion," TFO Richards' suggestion that he would benefit under the federal system by accepting responsibility, TFO Richards' promises to place him in touch with his mother and to contact the towing company, and TFO Richards' discouragement against requesting a lawyer because it would "just not" be practical.

Counsel have not pointed to any cases quite like this one and the Court in its own research has not found a case with precisely similar facts.  In *Kyger v. Carlton*, the Sixth Circuit suppressed statements made after police told the defendant "if

you've got something to hide, I can understand you not wanting to sign that.  If you ain't got nothing to hide, you know, you can answer our questions."  146 F.3d 374, 379 (6th Cir. 1998).  The *Kyger* Court found the officer's attempt to discourage the defendant from invoking his right to counsel "render[ed] this questioning constitutionally infirm."  *Id.*  Here, TFO Richards, rather than responding to Mr. Churchill's inquiry with the kind of clarifying question deemed helpful (although not required) in *Davis*, actively interfered with Mr. Churchill's understanding of his right to counsel and his ability to invoke it.  *See id.* ("[I]f [defendant]'s request was equivocal, the subsequent statement by the police . . . was an inappropriate effort at pressuring [defendant] to answer, rather than an appropriate attempt to get [defendant] to clarify his response"); *see also Miranda*, 384 U.S. at 454 (disapproving of just such a tactic); *Davis*, 512 U.S. at 461, 462 (approving the use of clarifying questions).  TFO Richards' insistence that "[i]t's not practical" mischaracterized the right to counsel, and disrespected Mr. Churchill's ability to understand the nature of his right and articulate his wishes.  *See Davis*, 512 U.S. at 460 ("The rationale underlying *Edwards* is that the police must respect a suspect's wishes regarding his right to have an attorney present during custodial interrogation").

In *Simpson v. Jackson*, the Southern District of Ohio found that police, in "indicat[ing] to [defendant] that he only needed a lawyer if he had lied or intended to lie . . . crossed the line from stating the truth to distorting the truth and, arguably, to giving legal advice."  No. 2:06-cv-127, 2014 U.S. Dist. LEXIS 158718, at *27 (S.D. Ohio, Nov. 10, 2014).  The district court emphasized that "[f]raming the issue in this

way is inherently coercive and violative of *Miranda*" and that "such a tactic is highly likely to taint an interviewee's decision-making calculus." *Id.* (citing *Miranda*, 384 U.S. at 454-55).

Here, as in *Simpson*, law enforcement agents "r[a]n a high risk when they move[d] into the realm of offering advice" as Mr. Churchill "correctly viewed [TFO Richards] as having superior knowledge about his circumstances and options." *Id.* at *28-29. As in *Simpson*, Mr. Churchill asking "I can have a lawyer?" "was certainly not an unequivocal request for counsel, [but] was at least an equivocal expression that he was considering speaking to counsel." *See id.* at *26. As in *Simpson*, TFO Richards' follow-up statements about the practicality of getting an attorney "show[] that [he] thought that [Mr. Churchill] might have been requesting counsel." *See id.* As the *Simpson* court pointed out, allowing these statements in would tell law enforcement that although they "may not discourage interviewees from persisting with their request for counsel after they have already requested counsel," they "may preemptively discourage them from seeking the advice of counsel after informing them of the right to counsel but before they actually request counsel." *Id.* at *26-27 (deeming this "an unreasonable reading of *Miranda*, which expressly disapproved of such a tactic").

Moreover, this case is unlike *United States v. Monroe*, 264 F. Supp. 3d 376 (D.R.I. 2017), in which the district court denied a motion to suppress the defendant's statements despite his insistence that law enforcement "misrepresented [his] rights and dissuaded him from invoking" his right to counsel. *Id.* at 387. The district court

50

concluded that "[defendant] did not misunderstand his rights" and emphasized that the agent's statement that "[proceeding without an attorney] makes it . . . quicker" was "not untrue." *Id.* The court reasoned that "undoubtedly [the agent's] task of gathering evidence . . .was quickened by [defendant] foregoing an attorney during questioning; and [the agent's] statement was a reasonable reaction to [defendant]'s equivocal statement" as "it left the door open for [defendant] to either to invoke his right unequivocally or to continue talking." *Id.* The district court concluded that something "more than the comment . . . is needed to constitute a *Miranda* violation." *Id.*

Here, TFO Richards' discouraging statements were "something more." *See id.* His misleading characterization of the right to counsel, in the face of Mr. Churchill's confusion and request for clarification, is unlike the *Monroe* agent's acknowledgement that immediately proceeding with questioning is "quicker" than waiting for counsel to arrive. *See id.* It impermissibly functioned to close the door on Mr. Churchill's opportunity to consider his right to counsel and to decide how he wanted to proceed— without pressure or misinformation from his interrogator.

Under the totality of the circumstances test, the Court concludes that Mr. Churchill's statements made after he was told invoking his constitutional right to

counsel was "not practical" were not made pursuant to a knowing and intelligent waiver, and thus should be suppressed.

## IV.   CONCLUSION

The Court GRANTS Kristopher Churchill's Amended Motion to Suppress (ECF No. 33).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 12th day of January, 2022